UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
EZRA BAPTIST, JULIET PEARCE, MARGARET LEWIS,    **JURY TRIAL DEMANDED**
JAMIE SANIN, CAROLYN LECHUSZA AQUALLO, and
CHELSEA VILLALBA, on their own and on behalf of a class    1:24-cv-1478 (AMN/TWD)
of similarly situated individuals who suffered excessive force
during their unlawful arrests, and MICHELLE RIDDELL, on
her own and on behalf of a class of similarly situated individuals
unlawfully arrested,

            Plaintiffs,

vs.

DARRELL P. WHEELER in his individual capacity,
SHERIFF JUAN FIGUEROA, in his individual capacity,
OLIVIA BACHOR and THOMAS BRUSCA, as
representatives of a defendant class of New York State
Police Officers who violated plaintiffs' rights
as set forth herein and who are sued in their individual capacities, DEPUTY SHERIFF HARDER, as a representative
of a defendant class of members of the Ulster
County Sheriff's Office who violated plaintiffs' rights
as set forth herein and who are sued in their individual capacities,
PO YUKOVICH, Shield No. 16, as a representative of the
class of members of the New Paltz State University Police
who violated plaintiffs' rights as set forth herein and are
sued in their individual capacities,

            Defendants.
-------------------------------------------------------------------------x

## CLASS ACTION COMPLAINT

By and through their counsel, Michael H. Sussman, Esq., plaintiffs, United States citizens, hereby file this action and seek class certification as representatives of plaintiff classes and against defendants and identified defendant class representatives pursuant to Rule 23 of the Federal Rules of Civil Procedure.

This case stems from a concerted effort by several law enforcement agencies to suppress and then publicly misrepresent plaintiffs' peaceful demonstration at a public university. Following

1

the tradition of nonviolent campus speech and expression, students and others gathered to protest the atrocities committed by the Israeli government with the active military support of the United States. Thereafter, defendants stormed the nonviolent assembly with the intent of disallowing plaintiffs from continuing their peaceful demonstration, falsely arrested those involved and brutalized many of the plaintiffs.

**PARTIES**

1. Plaintiff EZRA BAPTIST is an undergraduate student at the State University of New York New Paltz (SUNY New Paltz). While engaging in peaceful protest on May 2, 2024, he was unlawfully arrested and subjected to excessive force as part of a coordinated effort to suppress plaintiff class members.

2. Plaintiff JULIET PEARCE is a recent graduate of SUNY New Paltz. While engaging in peaceful protest on May 2, 2024, she was unlawfully arrested and subjected to excessive force as part of a coordinated effort to suppress plaintiff class members.

3. Plaintiff MARGARET LEWIS is a community member who resides in New Paltz. She was lawfully at SUNY New Paltz on May 2, 2024, when she was unlawfully arrested and subjected to excessive force as part of a coordinated effort to suppress plaintiff class members.

4. Plaintiff JAMIE SANIN is a graduate of SUNY New Paltz and a community member. She was lawfully at SUNY New Paltz on May 2, 2024, when she was unlawfully arrested and subjected to excessive force as part of a coordinated effort to suppress plaintiff class members.

5. Plaintiff CAROLYN LECHUSZA AQUALLO is a musician and an educator who resides in Kingston, New York. She was lawfully at SUNY New Paltz on May 2, 2024, when she was unlawfully arrested and subjected to excessive force as part of a coordinated effort to suppress plaintiff class members.

6. Plaintiff CHELSEA VILLALBA is a community social worker and a member of a local human rights advocacy group who resides in Kingston, New York. She was lawfully at SUNY New Paltz on May 2, 2024, when she was unlawfully arrested and subjected to excessive force as part of a coordinated effort to suppress plaintiff class members.

7. Plaintiff MICHELLE RIDDELL is a special education teacher who was lawfully at SUNY New Paltz when arrested without cause or basis as part of a coordinated effort to suppress plaintiff class members.

8. Defendant DARRELL P. WHEELER is the President of SUNY New Paltz and violated plaintiffs' rights as set forth herein by ordering the forceful removal of students and others engaging in nonviolent protest on the campus.

9. Defendant SHERIFF JUAN FIGUEROA is the Ulster County Sheriff and he personally ordered members of the class of Ulster County Sheriff deputies to unlawfully disperse and arrest lawful protestors on the New Paltz campus on May 2, 2024 and then made false public representations about the basis for this police action.

10. At all times relevant hereto, defendants OLIVIA BACHOR and THOMAS BRUSCA served as members of the New York State Police (Troop F) both of whom directly participated in the unlawful conduct set forth herein and represent a class comprised of 114 members of the New York State Police who violated plaintiffs' rights as set forth herein.

11. At all times relevant hereto, defendant Deputy Sheriff HARDER served as a member of the Ulster County Sheriff's Office who directly participated in the unlawful conduct set forth herein and represents a class comprised of numerous members of the Ulster County Sheriff's Office who violated plaintiffs' rights as set forth herein.

12. At all times relevant hereto, defendant Police Officer YUKOWICH was a member of the New Paltz State University Police and directly participated in the unlawful conduct set forth herein and represents a class comprised of numerous members of that agency who violated plaintiffs' rights as set forth herein.

## JURISDICTION

13. As defendants violated rights guaranteed by the First and Fourth Amendments to the United States Constitution, this Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. sections 1331, 1343 (3) & (4) and 42 U.S.C. sections 1983 and 1988.

## FACTUAL ALLEGATIONS

14. On April 29, 2024, New York State Governor Kathy Hochul wrote a letter to college and university presidents across the state, urging them to "aggressively guard against antisemitism and all forms of hateful or discriminatory rhetoric."

15. Later that week, on the afternoon of May 1, 2024, SUNY New Paltz students erected a "Liberation Zone" encampment on campus to protest the ongoing genocide in Gaza and demand SUNY New Paltz divest from entities profiting from this violence.

16. New Paltz Students for Palestine, an unofficial student group, organized this nonviolent demonstration, including educational activities such as teach-ins, talks, and group discussions.

17. A week prior, New Paltz Students for Palestine held a peaceful rally against the University's ties to Siemens; the May 2nd demonstration was a continuation of these nonviolent protests.

18. The encampment was located on Parker Quad, an outdoor lawn that sits between Gage, Bliss, and Scudder residential halls and regularly serves as a public forum for campus events and activities. Students had marked this area with hand-painted banners depicting peace signs, calls for Palestinian freedom, and demands for divestment.

19. About 70 SUNY New Paltz students and community members, including plaintiffs Ezra Baptist, Jamie Sanin, and Chelsea Villalba, assembled on Parker Quad to help set up tents, deliver supplies, including food and water, and offer their support.

20. Soon after, New York State Police officers arrived at the encampment, including Trooper M. Hart and an unidentified female trooper. When they approached the demonstrators, a student explained, "We are all students demonstrating peacefully, and our intention is to raise awareness to [sic] Israeli contracts that the school has."

21. The female trooper advised that while protesting was permitted and the public was allowed on campus, the University prohibited tents.

22. She warned the students they could face "campus judicial" action.

23. Officers from the University Police Department and New Paltz Police Department were also present and had similar interactions with demonstrators.

24. Plaintiff Chelsea Villalba acted as a liaison between the demonstrators and law enforcement, advocating for the group's rights to free speech and peaceful assembly.

25. At or about 2:15 pm, SUNY New Paltz President Darrell P. Wheeler visited the encampment.

26. Lucas Peterka, a student, outlined the demonstrators' demands that the University disclose its investments, divest from companies funding Israel, disengage from companies identified by the Boycott Divestment and Sanctions (BDS) movement, and drop academic sanctions against those participating in the demonstration.

27. President Wheeler admonished the students, claiming their tents violated University policy.

28. Before he left, he made a perfunctory remark, suggesting the SUNY New Paltz demonstration "not escalate."

29. In response, a student assured him, "We are here peacefully."

30. At 7:20 pm, President Wheeler issued a campus announcement reiterating his warning, emphasizing that having the protestors remove their tents was one of the University's "primary goals" and citing the Student Handbook: "No persons shall erect a tent, lean-to, or other temporary structure with the intent to utilize such for overnight occupancy."

31. Throughout the evening, patrol vehicles circled the Quad while demonstrators maintained their peaceful presence in the encampment.

32. The next day, on May 2, 2024, the demonstrators resumed their peaceful activities, with Jamie Sanin and a Palestinian alumna scheduled to publicly discuss campus free speech.

33. However, at or about 3:15 pm, Assistant Vice President for Student Wellbeing Kathleen Lieblich and Assistant Vice President for Student Affairs Michael Patterson interrupted the demonstrators' programming to address the encampment.

34. AVP Lieblich and AVP Patterson told those assembled that the University would grant the students amnesty and discuss their other demands if they removed their tents by 7:00 pm.

35. Later, at 5:25 pm, President Wheeler issued a campus communication, which restated the University's ultimatum.

36. Shortly after that, New Paltz Village Deputy Mayor Alexandria Wojcik, a SUNY New Paltz alumna, went to the encampment, where she met with a group of students and pleaded with them to remove the tents and warned of potential police action.

37. The demonstrators complied and, by about 6:30 pm, they took down their tents.

38. Notwithstanding this action, on May 5, 2024, defendant Figueroa issued a public statement justifying his actions and those of the Ulster County deputy sheriffs he commanded in which he falsely claimed that before the police action complained of herein, demonstrators "expanded their

encampment near Gage Hall, well beyond the permitted designated free speech zone and caused it to be an unlawful assembly."

39. By 7:00 pm on May 2, 2024, about 200 people had gathered, including plaintiffs Juliet Pearce, Margaret Lewis, Carolyn Lechusza Aquallo, Michelle Riddell, and Chelsea Villalba.

40. Several protestors brought medical supplies, ready to assist demonstrators if police attacked, while others watched from afar.

41. At about 7:15 pm, AVP Lieblich and AVP Patterson returned, acknowledged that the students had removed their tents, and, without providing justification, instructed them to disperse by 9:00 pm.

42. When a student asked what would happen at 9 pm, AVP Patterson replied, "I don't have an answer to that."

43. In the middle of the Quad, the demonstrators, including the plaintiff class representatives, formed a "human chain," interlocking their arms and legs on the ground, a symbol of peaceful unity.

44. For several hours, the demonstrators remained in this circle, chanting protest songs and reviewing safety steps in case of police violence.

45. At no time did the plaintiff class representatives or class members engage in violence, disrupt, intimidate, or threaten others, or interfere with the orderly operation of the University.

46. Despite these facts and out of opposition to the "anti-genocide" message plaintiffs were actively promoting, at 10:20 pm, President Wheeler announced the University's decision to deploy police to "remove the encampment."

47. By then, the encampment had been dismantled; only members of the plaintiff classes remained, engaged in peaceful protest on public space.

48. In his announcement, President Wheeler falsely depicted the encampment as "a growing threat" that endangered the University's academic mission and campus safety.

49. Plaintiffs' goal—to raise awareness of the genocide in Gaza—was wholly consistent with the University's academic mission, which "encourages and supports active participation in scholarly and artistic activity."

50. The Student Handbook explicitly protected plaintiffs' conduct, stating: "Peaceful picketing and other orderly demonstrations in public areas of grounds and buildings will not be interfered with."

51. Like defendant Figueroa, defendant Wheeler cited baseless reasons for his action: the demonstration displaced other student groups, caused fear and discomfort, and attracted non-University participants, citing a social media post that invited "students, faculty, and community members" to campus.

52. At or near 9:30 pm, law enforcement descended on campus, having established a joint command center involving SUNY New Paltz University Police, New York State Police, Ulster County Sheriff's Office deputies and members of the New Paltz Police Department.

53. Onlookers watched in fear as a convoy of more than 15 patrol vehicles from the New York State Police and Ulster County Sheriff's Office, accompanied by at least 30 officers on foot, advanced toward Parker Quad. Additional vehicles were parked outside Ridgeview Hall.

54. At or about 10:03 pm, from one of the patrol vehicles, an unidentified officer issued the first dispersal order over a loudspeaker, declaring the gathering was "unlawful" without any lawful basis and giving protesters ten minutes to clear the area. The order was barely audible over the demonstrators' chants and the noise from surveillance drones and helicopters circling overhead, adding to the confusion.

55. Two subsequent dispersal warnings followed: one at 10:18 pm and a final two-minute ultimatum at 10:28 pm.

56. At 10:20 pm, President Wheeler issued a campus update: "The demonstrators have neither dispersed nor indicated an intention to do so. We are now initiating removal of the encampment by the police."

57. Defendant Figueroa supported this unlawful use of his members to stifle plaintiffs' exercise of their rights of assembly and free speech.

58. By this time, "the encampment" consisted of plaintiff students and others continuing their peaceful protest against the atrocities in Gaza.

59. Around that time, officers from the State Police and Ulster County Sheriff's Office lined up outside Gage Hall. They stood clad in riot gear with K-9 units beside them, threatening plaintiff class members.

60. At or about 10:30 pm, officers from the State Police and Ulster County Sheriff's Office stormed the former encampment area, tearing down and trampling the demonstrators' banners, which contained constitutionally protected speech.

61. Contrary to President Wheeler's claim that the University Police Department was the "frontline engagement" and that the "riot police" was "the final line of defense that were only supposed to come to campus if things got out of hand," at 10:30 pm, defendant classes came together and stormed the students.

62. Law enforcement defendants surrounded seated demonstrators, shined flashlights in their faces, and systematically removed them while they continued chanting.

63. Defendant officers moved in a tight, coordinated formation.

64. Directed by a commanding officer, they would create openings in their line, through which teams of two to five would rush forward.

65. These teams would then grab demonstrators by their arms, legs, or clothing and drag them several feet behind the police line before closing the gap and reforming their ranks.

66. Even when demonstrators offered no resistance, officers continued to forcibly remove them one by one, causing varying degrees of injury and distress:

    a. Two unidentified male officers seized Ezra Baptist by his arms, yanked him forward, and threw him headfirst into a pallet stacked with water bottles and food supplies. This force caused him to strike his head on the pallet, resulting in a deep gash in his scalp that bled heavily. Unidentified officers then dragged him by his arms, his legs trailing behind, and placed him in zip-ties handcuffs. Baptist asked them if his head was bleeding. One of the officers curtly replied, "Yes." Despite Baptist's visible head injury, he received no immediate medical attention. Defendant Brusca is identified as the arresting officer of plaintiff Baptist.

    b. An unidentified male officer attempted to remove Chelsea Villalba, but instead of holding her arms, he inappropriately touched her breast and squeezed her nipple. Other unidentified officers then dragged her by her limbs and forced her onto her stomach. Villalba yelled, "You're hurting me. Get off." In response, an unidentified officer dismissively said, "You're fine," and proceeded to place her hands in zip-tie handcuffs. A member of the New York State Police, shield number 3226, signed plaintiff Villalba's appearance ticket, charging her with trespassing.

c. Four unidentified officers each grabbed one of Jamie Sanin's limbs to remove her from the circle. They lifted her face up to move her aside before tightly zip-tying her wrists, causing her pain.

d. Two unidentified female officers grabbed Carolyn Lechusza Aquallo by her arms and legs, pulled her from the circle, forced her onto her stomach, searched her backpack and person, including her pockets, and then secured her hands in zip-tie handcuffs, fastening them painfully tight. Defendant Bachor is identified as the arresting officer for plaintiff Lechusza Aquallo.

e. Two unidentified officers advanced toward Juliet Pearce after an officer ordered, "Get her." Pearce sat beside her classmates and professors when the officers grabbed her by her ankles and dragged her forward with her upper back and head hitting the ground before they fastened her hands in zip-tie handcuffs.

f. Unidentified officers pulled Margaret Lewis, a woman in her 80s who used a cane, from the circle and forced her face-down on the ground. During the confrontation, they knocked her cane away, leaving her disoriented and lightheaded with bruises on her inner thigh. Defendant Brusca is identified as the arresting member of plaintiff Lewis.

g. As officers, including defendant Harder approached to arrest her, Michelle Riddell beseeched them not to handcuff her behind the back because her arm was broken. After ten minutes of sustained pleas to take care of her arm, the officers, including defendant Harder, handcuffed her in the front before leading her away; thereafter defendant Harder was identified as the arresting officer and defendant Yukovich signed an appearance ticket falsely alleging that plaintiff Riddell was engaged in trespassing while on the ground of the state university

67. As bystanders shouted, "These are students!" and "You're hurting them!," unidentified officers employed similar tactics against plaintiff class members, ignoring their pleas to stop along with their requests for badge numbers and identification.

68. Several times, unidentified officers prodded, jabbed, and pushed seated demonstrators with batons:

   a. In one incident, three unidentified state troopers gripped their batons with both hands in a downward position and repeatedly jabbed a student's arms and legs, nearly hitting their face. Other officers, including members of the Ulster County Sheriff's Office, then grabbed nearby protesters. At least one carried what appeared to be an airsoft rifle and pointed it downward at a student who was lying on their back on the ground just feet away.

   b. In another incident, unidentified officers repeatedly jabbed their batons into a student's underarms, leaving bruises, before dragging her away and throwing her face down. An officer then pressed his boot into her back while she yelled, "You're hurting me." He then ripped off her keffiyeh scarf, which constituted protected speech, and bound her wrists with overly tight zip-tie handcuffs.

   c. In a third incident, an unidentified officer jabbed a student three times in the underarm area and once in the chest. The officer then used a baton to pry at the student's body while other officers dragged the student away.

69. Police violence against demonstrators escalated further when an unidentified officer commanded, "Platoon. 20 steps forward," prompting a line of over 30 officers from the New York State Police and Ulster County Sheriff's Office to advance forward, counting their steps. Brandishing their batons, they forced demonstrators and bystanders to move backward.

70. The officers broke into a charge by their fifteenth step, sending students and others fleeing in panic.

71. The officers then chased the demonstrators, grabbing them from behind. One seized a demonstrator so violently he ripped the person's shirt off completely.

72. Three others grabbed another student, forced him face-down onto the ground, and pinned him there, kneeling around him and pressing their hands against his back as they zip-tied his wrists.

73. By about 11:47 pm, law enforcement fully sealed off the Quad and blocked movement between residence halls, which remained under University lockdown.

74. Officers escorted arrestees to the Health and Wellness Center parking lot, where they were detained without access to restrooms or water.

75. During the processing line, an unidentified female officer asked Lechusza Aquallo for her identification card. Lechusza Aquallo explained it was stored on the left side of her bra.

76. Despite this clear information, the officer reached into both sides of Lechusza Aquallo's bra, inappropriately touching her breasts.

77. As demonstrators awaited processing, numerous officers engaged in other forms of dehumanizing and mocking behavior.

78. Officers loudly joked with one another, "I've been waiting all day for this."

79. While Juliet Pearce was consoling her distressed classmate in line, saying, "I love you," an unidentified male officer interrupted mockingly, "I love you, too."

80. At the front of the line, Pearce requested permission to retrieve her bag from the Quad, explaining that it contained essential medication for several health conditions, including severe asthma.

81. An unidentified officer responded, "Thanks for letting me know," but made no attempt to accommodate her medical needs or permit Pearce to retrieve her medication.

82. When Jamie Sanin reported pain from her zip-tie handcuffs, an unidentified officer replied, "I'll loosen them just so we're even."

83. When Lechusza Aquallo complained of similar pain, an unidentified officer told her, "I don't know how to loosen it."

84. At some point during the detention in the parking lot, Margaret Lewis collapsed and was transported by ambulance for emergency medical care.

85. Meanwhile, Ezra Baptist, who had an untreated head injury, waited in line to be processed before being further detained with a classmate in a police van.

86. Unidentified Officers repeatedly denied his classmate's requests for water and to loosen her zip-tie handcuffs.

87. An hour later, an unidentified officer finally loosened her painfully tight zip-tie handcuffs, which had left her wrists swollen and discolored, before transferring her and Baptist to the Highland Barracks.

88. After officers finished processing Baptist at Highland, he was taken to the hospital, where he finally received medical care, including several staples to close his head wound.

89. Officers continued transporting plaintiffs to different barracks in stages, where they were further detained for several hours.

90. By the early morning of May 3, 2024, Parker Quad stood silent.

91. Plaintiffs' abandoned belongings lay scattered on the ground—identification cards, medication, cell phones, and academic essentials like laptops and textbooks—items many were never able to retrieve.

92. After the demonstration, bulldozers swept through the Quad, destroying plaintiffs' belongings and all remaining banners containing constitutionally protected speech.

93. The destruction of these belongings caused challenges for students financially, personally, and academically. Without their phones, they could not contact worried family and friends. Without their laptops and books, they lacked essential tools to complete their academic work.

94. Police arrested over 130 demonstrators, mostly students, for trespassing and/or engaging in "disorderly conduct" while they peacefully assembled to express their views on public property.

95. Plaintiffs were required to appear several times in the Town of New Paltz Justice Court, causing many inconvenience and expense.

96. Eventually, the District Attorney of Ulster County dismissed all charges against all plaintiff class members. The District Attorney emphasized that none of those charged engaged in violence and that their actions were motivated by a belief that all people deserve to live with dignity and respect.

97. On May 3, 2024, after the police action, the SUNY New Paltz Student Association condemned the University administration's decision to mobilize law enforcement against peaceful student demonstrators, denouncing the ensuing police violence as "excessive" and "unnecessary."

98. *The New Paltz Oracle*, the official student newspaper of SUNY New Paltz, also deplored the administration's actions: "No one deserves to see their classmates and friends brutally ripped away from one another and beaten with batons. No student deserves to see their professors treated in the same way. No student themselves deserves to be assaulted by police officers on their own campus. These are people we share a community with. That community was greatly damaged [on May 2nd]."

99. This outcry extended beyond students. Several others, including faculty, staff, and alumni, have voiced similar views and called for President Wheeler's resignation.

100. In a letter to President Wheeler and SUNY Chancellor King, 130 SUNY New Paltz faculty and staff wrote, "While we may hold differing views on the Israeli Palestinian conflict, the Israel-Hamas war, and the protesters' rhetoric, we stand united in condemning the police response as a brutal infringement of First Amendment freedoms."

101. Instead of resigning, President Wheeler expressed regret for his overreaction and for the pain and suffering he caused. He publicly posed these questions: "Where are the places that I could have done better? Where are the places I could have engaged, as we talked about it with student association, where could I have engaged allies in this process? How could I have worked with Albany, as we call it, better in a more productive way? How could I have done these things? Those are the things I'm looking for."

102. President Wheeler publicly claimed he ordered University police to come in and move the encampment [which had already been taken down] and did not intend for 170 members of law enforcement [the number confirmed to have engaged in this assault on democracy] to respond as they did.

103. President Wheeler expressed remorse after ordering the assault on the students, claiming he wished he had "focused first on supporting members of our community who have experienced trauma over the last few months and days rather than moving immediately to focusing on the path forward...In my eagerness to provide a clear signal of campus leadership's priorities and planning, I did not adequately serve a campus community that needed time and space for processing intense emotions. I deeply regret the pain many of you are feeling."

104. On May 4, 2024, students who were arrested received emails from the Office of Student Conduct and Community Standards stating they faced disciplinary action in violation of the Student Handbook/Code of Conduct. The email warned of "sanctions that may be applied up to and including expulsion" and that further violations would result in increased penalties, including "immediate interim suspension."

105. In fact, SUNY New Paltz took no disciplinary action against the student plaintiffs who had engaged in no sanctionable conduct and, instead, represented the best of what our country stands for on May 2nd and before.

106. Acting in concert, defendant classes suppressed plaintiffs' constitutionally protected right of speech and assembly.

107. The prohibition against content-based censorship and oppression was clearly established by May 2, 2024.

108. By and through the force used against plaintiffs, defendants caused the class of plaintiffs varying degrees of physical and mental injury, anguish, pain, and distress.

109. By failing to intervene in the presence of patently excessive force, defendant law enforcement classes affirmatively increased the danger to all class members and violated their rights.

110. The actions each agency engaged in were neither random nor arbitrary but part of a uniform and concerted policy which represented a coordinated effort by these institutions and their members to violate plaintiffs' constitutional rights by suppressing their peaceful demonstration and causing them to suffer for exercising these rights.

**CAUSES OF ACTION**

111. Plaintiffs incorporate by reference paragraphs 1-110 as if fully set forth herein.

112.    Defendants Wheeler and Figueroa and defendants Bachor, Brusca, Harder and Yukovich and the class members the latter four defendants represent violated plaintiffs' First Amendment rights to freedom of speech, assembly, and protest, as made actionable by 42 U.S.C. section 1983.

113.    Defendants Wheeler and Figueroa and defendants Bachor, Brusca, Harder and Yukovich and the class members the latter four defendants represent violated plaintiffs' Fourth Amendment rights by seizing, or ordering them to be seized, without probable cause or arguable probable cause that any of them had engaged in criminal conduct, as made actionable by 42 U.S.C. section 1983.

114.    Defendants Wheeler and Figueroa and defendants Bachor, Brusca, Harder and Yukovich and the class members the latter four defendants represent violated plaintiffs' Fourth Amendment rights by using or ordering the use of excessive force against plaintiffs, as made actionable by 42 U.S.C. section 1983.

115.    Defendants Wheeler and Figueroa and defendants Bachor, Brusca, Harder and Yukovich and the class members the latter four defendants represent violated plaintiffs' constitutional rights by maliciously arresting them or ordering their arrest without probable cause in violation of the Fourth Amendment, as made actionable by 42 U.S.C. section 1983.

**CLASS ACTION ALLEGATIONS**

116.    Plaintiff class representatives raise claims that are common to those possessed by all members of the class who are too numerous to be practically joined as individuals in this lawsuit.

117.    The common questions of fact and law predominate over issues that may be dissimilar between class members.

118.    The claims raised by class representatives are also typical of the legal claims possessed by the other class members.

119.    Class representatives have no interests dissimilar from class members.

120.    Judicial efficiency and economy will be furthered by recognizing this as a class action.

121.    Plaintiffs' counsel is an experienced civil rights lawyer who has successfully represented other classes.

122.    Defendant class representatives Bachor, Brusca, Harder and Yukovich and members of the defendant classes have typical defenses common to the class they have been designated to represent.

123.    Defendant class representatives Bachor, Brusca, Harder and Yukovich and members of the defendants classes carried out unlawful policies as a unified group, acting in concert in the same unlawful manner.

124.    It is expected that those defending defendant class representatives will vigorously defend the interests of defendant class members who should be accorded the opportunity to opt out of the class and defend themselves individually.

125.    The interests of equity and judicial efficiency strongly favor declaring this a defendant class action and recognizing the designated and named defendants as class representatives.

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiffs pray that this Honorable Court accept jurisdiction over this matter, declare this to be a class action in which the named plaintiff class representatives respectively represent plaintiff class members and the named defendant class representatives

represent defendant class members—that is, members of respective law enforcement agencies who acted under uniform directions and committed the same violations of plaintiffs' constitutional rights—award to plaintiffs compensatory and punitive damages on each of their causes of action against the individual defendants and defendant classes as is consistent with law, and award attorneys' fees and costs to counsel for the plaintiff classes.

Dated: December 5, 2024

Respectfully submitted,

_____
MICHAEL H. SUSSMAN [103324]
Sussman & Goldman
1 Railroad Avenue, 3rd Floor.
P.O. Box 1005
Goshen, NY, 10924
(845)-294-3991
Counsel for Plaintiffs